United States Court of Appeals to the Third Circuit. Oyez, oyez. All persons having business with the Honorable United States Court of Appeals to the Third Circuit are admonished to draw near and give their attention. For this court is now in session. God save the United States and its Honorable Court. Please be seated. Good morning. Thank you again. Just take a second or two to thank Judge Pollack for sitting in with us today. He also sat in with us yesterday and honors us with his presence. So again, Judge Pollack, thank you very much for helping us out. Thank you again for your welcome. First note is Coster v. Watts. Good morning, and may it please the Court. My name is Tom Roberts from Williams & Connolly, and I represent Jameer Nelson, representative of the appellant, Tony Coster, in this matter. And I'd like to reserve four minutes of rebuttal time. There are two issues in this case, and the first is that this is a Bivens action alleging deliberate indifference to a serious medical need of an inmate. And given that the serious medical need has been conceded, the remaining question is whether there is a subjective showing of deliberate indifference. That is, whether defendants knew of and disregarded a risk to Coster's health and safety, resulting in the infliction of pain and suffering unrelated to any valid penal purpose. One thing that confused me here, whenever he went to the medical folks at the institution, they always commented about how the hernia could be reduced with manipulation. It wasn't clear to me, though, that they actually either manipulated it to try to reduce it or did, in fact, manipulate it. But there are numerous notes and numerous visits where they said the hernia is the kind that could be reduced by manipulation. Is it your contention that they did manipulate it, but simply weren't successful in reducing it, or that they didn't bother to manipulate it, just noted that it could be manipulated successfully? I think that that changed over time. I think that initially there were indications. It wasn't always clear from the notes or from the beam declaration, which basically reiterates the notes, whether they were always manipulating it or not. There is discussion of it being reducible. What's interesting is that right at the time of August 2002, when they denied the surgery request, they say that the hernia at that time is easily reducible, but the only time that that actually appears in the notes is back in October of 2001. And thereafter, there's nothing in the medical record that indicates it was easily reducible. Now, I know that there's a contention that I think that what the government would like to try to do is to sort of say, as long as this is a reducible hernia, that's the end of the story. But I don't think that's the case. I mean, what we have here is, and what I would submit, just jumping to that point right away, is that what the facts that can be inferred from the record indicate is that medical judgment was not exercised in Mr. Koster's case. At which point? Because when he first reported, he said he had no problems. Yes. The pain is inconsistent. And then he's made some other statements which would suggest that he wasn't the best informant in terms of reporting his own medical condition. He demanded or asked for sinus surgery at one time. And it seemed to me to be the kind of presentation where the medical personnel could justifiably be somewhat skeptical about how accurately he was reporting his own medical condition. Well, I don't think, Your Honor, respectfully, that we should draw such an inference. Essentially, a negative credibility determination as to Koster. I mean, I think we have to accept. I'm not saying medical, a negative credibility determination. But if we're looking at deliberate indifference, it seems to me that his presentation, the way he presented his condition, is relevant to that inquiry. If he came in and was presenting that he was 10 out of 10 in terms of his pain, and he related that he'd been trying to deal with this as well as he could, but he was just getting to the point where he simply could not function anymore, and they ignore that, that's one thing. But if he comes in and says, well, I've got the sinus condition, I need surgery for that, one time he's 4 out of 10, one time he's 7 out of 10, initially he has no medical history, doesn't that go to whether or not a jury could find deliberate indifference? It does, Your Honor. But I think that the record is replete with evidence that he presented his pain. I mean, there are his account and his own verified complaint. But even if we put that to one side and just look at the medical record, which obviously the medical record is not necessarily accurate or does not necessarily fully capture his situation, but even if you just take a look at the medical record itself, you see something where he, May 2001, notes constant pain, and then April 1, 2002, painful inguinal hernia. What happened? He noted May 2, 2001, he went in, saw the physician, complained of pain, and they followed up by ordering laboratory tests. They came back. The creatinine levels were low, but they were consistent with prior tests. I mean, it seems to me that they were responding to his presentation. Well, there's some treatment that he receives. There's no question about that. But the issue is whether – I mean, that's not the end of the story, because you can have deliberate indifference where there's a delay in providing needed medical treatment or where there's a deliberate attempt to apply a less efficacious mode of treatment with the result being the pain and suffering of the inmate. And if it's a delay, then it has to be a reckless, wholly unwarrantable delay, does it not? Yes, that's correct. And I think that where we can ground that is that you have to take into account all of the facts that are in the record. So there are the statements by the defendants that they would not provide the surgery regardless of his health condition. And then we have a recommendation for surgery as of April of 2002. Did they ever say they wouldn't provide surgery regardless of his health condition or given the medical history and the fact that it still appeared to them to be reducible by manipulation, they weren't going to provide surgery because they didn't do that kind of surgery in the institution? Well, I think what they said to Mr. Koster was you have to wait until you're released from the prison. And what that means is – a fair inference from that is that regardless of the condition of his hernia, he would not be approved for surgery. Well, Fairbank said that initially, but after that they did treat. They gave him the hernia belt. Again, I'm not sure if they did try to manipulate, but it appears that they tried to manipulate at some point in this series. That troubled me, too. And I guess it goes in and he's doing what, a 20-year sentence, they say, or an eight-year sentence, and they say you can't get surgery until you're released. That was pretty stark. But then after that, they did seem to respond to his complaints. Surgery eventually came, although it came after a pretty protracted – your submission would be a pretty protracted and deliberate and different delay. Yes, Your Honor. And I'd also point out, I mean, there was the initial surgery recommendation in April. In May of 2002, it indicates hernia belt is not providing effective relief. Then in August of 2002, the second doctor on the committee, the only two doctors he recommends surgery, and yet when the doctors are at the Utilization Review Committee, those same two doctors deny the surgery. There's no explanation for why they're telling Koster one thing and doing something else when they get to the Utilization Review Committee. And I would submit as well that at that point, it's also indicated in the notes of the Utilization Review Committee, which is at JA 152, tried conservative treatment. And so it's clear by the latest of August of 2002, they've tried the conservative treatment. The conservative treatment is not working. He was just there in May of 2002, and there was an indication of pain that averages 7 on a 1 to 10 scale, and yet not only was no surgery provided at that time, but the circumstances under which the surgery ultimately was provided were highly suspicious. Because even as of November 2002, by that point, the hernia is no longer easily reducible. It continues to grow, and yet no surgery is provided. And it is only immediately after he files a district court complaint in the latter part of January of 2003, that suddenly in early February 2003, he's sent to an outside surgical consultant. And not only that, but there's no explanation in the record of why. There's no prior approval from the Utilization Review Committee. Dr. Beam doesn't say, due to the changed conditions of his hernia, we now concluded as a matter of medical judgment that he deserved this surgery. It simply happened. So I think if you put all of these things together, the fact that they said they weren't going to provide the surgery, the fact that the conservative treatment was clearly not working, you have a background of numerous complaints of pain that are both in his complaint and in the medical record, and then also you have the clear growth of his hernia. I mean, it starts out, there's no mass reported in early 2001. In the latter part of 2001, it's a golf ball-sized shape. In April of 2002, it's fairly large. In May of 2002, it's a large hernia. At the end of November of 2002, it's down into his scrotum. And then he goes in for surgery, and they discover that he has a tumor that's covering 50 percent of his abdominal cavity. Everything you just described sounds like they tried conservative treatment, it didn't work, and then they performed surgery. Aren't we dealing with, at worst, medical malpractice? No, because I think what you see, as of August of 2002, they know the conservative treatment's not working. And he gets surgery six months later. But not to the... Don't sometimes a lot of people on the outside have to wait six months to get surgery? Obviously, circumstances may vary. But the question is, does it indicate an exercise of medical judgment, or is this consistent with a determination that they weren't going to provide him the surgery? And if you put together the fact that they told him they weren't going to do it, then you have the two doctors who are on the committee have both recommended surgery, and yet in August of 2002, they deny it. And then they only provide the surgery after... Then they do provide it. They do. But it's only in response... It's highly suspicious that he's basically rushed to a surgical consultant. Could I inquire... You say it's highly suspicious. Would the plaintiff's case be... How shall I put it? The plaintiff's case is strengthened by the fact that surgery was contemplated after suit was filed. When you say it's suspicious, I take it the implication is, gosh, suddenly the authorities realized they were getting sued, and they better do something about this. A recognition that they were at fault, or simply a recognition that somebody might think they were at fault, and it would be better if you clean this up right now. If there had not been surgery performed after suit began, would that change? Well, I think it would very much depend, but at least as I see the fact that they only provide the surgery after the lawsuit is filed, it goes to show that what was being done before were just stalling tactics, because the evidence calls into question the intent of the doctors in performing the treatment that they performed. And as the Dermer case instructs, if you have facts that lead you to question the intent of the doctors, then you have an issue that's not appropriate for summary judgment, which is where we are now. Thank you, Mr. Roberts. I think you reserved some time for about a minute. Yes, I reserved four minutes. Thank you. Okay. Good morning. May it please the Court. Donovan Kokus, Assistant United States Attorney on behalf of the Appellees. I want to take up an issue that's antecedent to the merits issue today, because as my opposing counsel indicated, he's here on behalf of a Mr. Jameer Nelson, the purported representative of Mr. Koster. The problem that we have with that is that there's been no proof at this time that Mr. Nelson is, in fact, Mr. Koster's son or that he is even a representative of Mr. Koster's estate, if there was one. And to illustrate the problems that we have with allowing any substitution at this late stage, I'd like to go through a brief timeline of what's happened. Did you give any notice of this prior? Did I miss something? You might have, Your Honor, because what happened was last summer, I learned for the first time that Mr. Koster had been deceased during the entire representation by pro bono counsel. And I informed them of that. They evidently did not know it. And when I informed them of that, I filed a suggestion of death on the record and moved the court to give them a suitable time to appoint a substitute, reserving my client's right to challenge the propriety of any substitute. You did that in the district court, I assume? No, no, no. This all happened on appeal. Okay. If I give a timeline, it may elucidate this a little bit. In March 2005, Mr. Koster is still alive, and he files this appeal. This appeal is docketed pro se. In January of 2006, Mr. Koster seeks appointment of a counsel on appeal for the first time. He's never asked for that in the district court, but he asked for it on appeal. In October 2006, Mr. Koster, he's been convalescing from his cancer up in a prison medical center in Rochester, Minnesota. He obtains compassionate release. And in November 2006, he returns to Cleveland, where his family is, and he passes away. Okay. November? I'm sorry? November of 2006? November of 2006, yes, Your Honor. In March 2007, the district court in the Northern District of Ohio notes his death on the record. That means as of March 2007, anyone with a PACER account and 40 cents and a reason to look can find out Mr. Koster is dead. October 12, 2007, this court, unaware that Mr. Koster has passed away, appoints pro bono counsel from Williams and Connolly. At that time, it was Chris Weideman. In the appointment letter, and this is pursuant to 28 U.S.C. 1915, counsel is invited to represent the client. He's not automatically his attorney yet. So he's given 60 days to review the file, and I submit also at least try to contact Mr. Koster to see if he still wants him to represent him or if he even wants to go forward with the appeal. Evidently, that's never done because we don't hear from counsel until November 2008 when Mr. Weideman asked for two months extension time to file the opening brief and appendix. We don't oppose that, believing the tacit representation that there's a live client behind all this. At that time in November 2008, you were not aware either of Mr. Koster's death? I was not aware either of it. You or your office? Our office was not. The reason, in fact, the BOP wasn't aware of it because as soon as he's released from their physical custody, he goes into the custody of the probation office for supervised release, so they don't know. If you look on the BOP locator, it just says released. So anyway, as of October of 2007, I couldn't contact Mr. Koster directly even if I wanted to. He's represented by counsel theoretically. So February of 2009, Mr. Roberts comes on the case for the first time, files a motion to substitute himself for Mr. Weideman, and asks for another extension of time to file the opening brief. Again, we don't oppose these things. March 2009, I enter my appearance, and I do what Mr. Weideman should have done in the first place, according to this court's letter, which is I try to verify from the BOP whether I have the entire medical record. In the course of making those inquiries, and it takes a couple weeks because the record's archived, the BOP tells me, yes, you have the medical record. But then the day after I file my brief, somebody who's on this e-mail chain says, by the way, we're curious why you want to know. Mr. Koster's been dead for years. So then I go to Pacer, and within 60 seconds I find out he's been deceased all this time. So I inform Mr. Roberts that his client has been deceased the entire time. I file the suggestion of death, and he attempts to move in Mr. Jameer Nelson. A motions panel last summer essentially kicked the can forward to this court to determine whether a substitution is proper. I think it provisionally allowed it to go forward, but the caption still remains, Tony Koster versus the appellees. So that's how we got where we are today. Well, that's all very helpful, Mr. Koster. I made a note here that the case is moot unless the estate pursues the claim, and we looked into this, and I thought, perhaps I'm mistaken, but I thought that some notice was filed or some substitution of party was filed in the record on behalf of the decedent. Is that not correct? That is correct, except there was no proof offered that Mr. Jameer Nelson is, in fact, the representative of Mr. Koster's estate, that he is his son. I mean, we can't have an evidentiary hearing on that, right? I mean, doesn't that need to be taken at face value, unless there's some sort of hearing held on that particular claim? There would need to be evidence taken, wouldn't there? Well, that's why all we asked for was a copy of a notarized birth certificate, something, because I have individual clients on the hook for Bivens damages, and the issue does go to standing. So unless it's demonstrated, and I would submit positively demonstrated, that he is who he says he is, there's no one withstanding to pilot this thing. It wouldn't have to be a relative, though, to him having to be there. No, it just needs to be some proof that he's a representative. He was offered to me as Mr. Koster's son, so that's why I asked for a birth certificate, but any proof would suffice. Where was the representation made that he was the son? In a telephone conversation? No, it's in a pleading that was filed in this court last summer when we were hashing out the substitution issue. So we have that objection, and I would waive it, except I think it goes to standing, so I can't, and I have individual clients on the hook. The other issue, too, is there's been no showing that Mr. Nelson, even if he is who he says he is, is indigent for purposes of a 1915 appointment. That's in the rule. So I understand the court could look the other way on that if it wants to, but I just flag that issue. And the last thing is that the entire substitution is way untimely. If Mr. Whiteman had done what this court asked him to do back in October of 07 and look at the record, he would have found out within that 60 days that Mr. Koster had passed away and that he had no client. And I submit he was required by the rules of professional responsibility to do that, and he didn't do it evidently. But suppose it took him the entire 60 days, he then would have had 90 more days under Rule 25 and Rule 43 of the Federal Rules of Civil Procedure to move in a proper substitute. That would have given him until March 11, 2008. Now contrast that to the first time a substitute was proposed was July of 09, and I submit to the court the only reason that happened was I found out that they didn't have a client. If I hadn't found that out, we would all be here litigating this appeal as though Mr. Koster were in this world and not the next. So it's – I submit that this is a very grossly overlinked substitution and I'd ask the court in its discretion to deny the substitution. Assuming that the court does reach the merits, however, I propose that we can take this case apart into three roughly co-equal bites. Before you get merits, I'm puzzled. Is this something that you and Mr. Roberts have explored together? The propriety of the substitution has been explored and I informed him of his client's death and I've discussed with him the whole issue that there's no proper substitution until there's proof that the substitute is an authorized person to proceed on behalf of the estate. So – and I'm sorry, Your Honor, that it comes to the court so late. The motions panel kind of kicked this forward. So – I wish you'd kick it back to the motions panel. I have no objection. Let's proceed with the merits. What we – I guess then we'd resolve the disaster with 28 J letters, try to resolve this issue and maybe attach to the 28 J letter Mr. Roberts. And if you seem like incredibly and eminently reasonable attorneys and very cordial, if there's a way to stipulate, and if you can't in good faith stipulate, you can't, but if there's a way based upon what Mr. Roberts will tender to you to stipulate to the authenticity of the proposed representative, we can go forward from there. No, I'd be happy to do that. Okay. On to the merits. And I would propose we can take this case into three bites. And the way I want to do that is just lay out the two claims Mr. Koester made in the district court against the eight defendants he made them and then apply the legal standard and we can see how this comes apart. The two claims that he made, one, the main one was deliberate indifference in the form of failure to treat aggressively his hernia condition with surgery. And the other claim sort of flows from the first one, which is his thinking that had aggressive treatment in the form of surgery been performed sooner, they would have discovered the cancer sooner. And those claims are brought against four medical defendants and four non-medical administrators at the prison. Now, applying the legal standard, the objective prong requires a showing of a serious medical need, and this court in its Monmouth County case in 1987 defined that, among other ways, as a need that has been diagnosed by a doctor. Now, based on the objective prong alone, the cancer is out of the case because there is no showing that these defendants are subjectively aware that he even has cancer until March 2003 when Mr. Koester is sent out for surgery and the doctor who opens him up to repair his hernia, which he does have, then discovers this rare cancer growing inside him. So that aspect of it is out of the case. The next bite, the second of the two bites, comes for the four non-medical defendants, namely Belitsis, Ward, LaManna, and Ray, all of those under this court's precedence in Dermer and I think also Spruill, who were permitted to defer to the medical judgment of the four medical defendants about Mr. Koester's health. Let me do that. It does seem to me curious that the two doctors say they're going to recommend surgery. When they're talking to Mr. Koester, they then go behind the magic curtain and sit with the Utilization Review Committee and will avoid nothing that comes back denial of the request for surgery. Right. That struck me, candidly, Your Honor, that struck me as odd, too, until I understood what the Utilization Review Committee is, which is it's essentially the doctors come in with a stack of case files that they need to discuss for more aggressive treatment than the prison can provide. They sit down and they say, okay, we have this patient. What do we think about the course of his progress? And some consensus is reached. So even if you assume, as I would, that let's give Mr. Koester the benefit of the doubt and the doctor who's writing in the chart that particular day, I'm going to recommend surgery, assume he believes that, he goes to the hearing, but then the other doctor there says, no, I disagree, I don't think it's time yet. What you have at most is a medical disagreement about the proper course of treatment. In this court, in White v. Napoleon, and Dermer has said certainly a medical disagreement doesn't arise to the level of deliberate indifference. What do you make of opposing counsel's emphasis on the statement that, well, you can't have surgery until you're released? Well, first of all, I would assume, let's assume for the sake of argument that that was stated to him. I think that was stated. We have to. I'm sorry? We have to. Right, we have to. The problem is that's inconsistent with what we know in the record, which is that they did consider him for surgery multiple times, and they did, in fact, go perform surgery on him before he was released. So, I mean, and on top of that, he subjectively did not believe he couldn't have surgery until he was released because he cited all these cases where he claimed other inmates got surgeries. So even if this was being said to him, he didn't believe it. Could we go back for a moment to the Utilization Review Commission? You characterized this as a disagreement. A couple of physicians thought surgery was appropriate. Others didn't. But the proponents of surgery, as I understand it, joined in as committee members in saying, no, we don't need anything. Is that the way a disagreement gets resolved? I suspect it is, Your Honor, and I was trying to think of this in terms of what you three will do. It may be that you three will go back and you'll have ideas about how a case should be decided, but then it could be you'll be talked out of those ideas by your colleagues. And I think that's how the URC works in these cases. And it's after, you know, you have multiple sets of eyes looking at the patient's case file and the progress of his treatment. Don't we have to have more facts, though? More facts such as? As to what really was going on in the committee? I don't think that we need that, only because we know the committee did meet. We know they contemplated surgery. We don't know what was said, but we know ultimately they concluded to stay the course with conservative treatment. And we also know, looking at the 22-month record, I was able to count five times where Mr. Koster had complained of pain, and each of those times I could find areas where they treated it some way via manual reduction. And I would submit manual reduction must have been performed because you don't know it's easy to reduce something unless you're actually reducing it, I would say. It would be like if you go to your chiropractor and he says, oh, your shoulder's dislocated, that's easy to put back in. I don't think he knows how easy it is until he tries. The other implication is he goes really – It was never reduced, though. I'm sorry? But it was never reduced. It may have been easily reducible, but it was never really reduced. No, Your Honor, the way it works is they physically push the tissue back up inside the patient, and then the patient can go with either belt, restricted duty and sleep restrictions, that kind of thing, and the hernia can stay reduced for a period of time. And sometimes it can heal over. That's why conservative treatment is attempted at all. And it seems that in this case that gave him some relief because he would, you know, not show up to sick call for months on end and then show up and say, my hernia's giving me problems again. Well, I couldn't agree with you. The thing with the Utilization Review Committee is, as I understand it, two doctors and two laypersons. Yes. There came a time when both the doctors on the Utilization Review Committee had independently recommended two-cluster surgery, but then both, when they go behind the curtain, say no surgery. Now, you may be absolutely right in terms of what happened, but why couldn't a jury look at that and conclude that they were utilizing the review committee as a subterfuge and, in fact, they never had any intention of treating him, and if they could conclude that with surgery? If they conclude that, wouldn't that give you deliberate indifference? Because you've got the doctors saying surgery is necessary, but on the other hand, denying him the treatment which they said was necessary. Why wouldn't that be enough for a jury to conclude deliberate indifference? I don't think it would in this case, Your Honor, because at one time you have one of the doctors recommending surgery, and on the second time you have the other doctor recommending surgery, but you don't have them recommending that at the same time. So I don't think you can draw the inference that at any point in time both the doctors looked each other in the eye and said, yes, surgery is required here, but we're not going to give it to them. Well, why couldn't they? Because you have Dr. A saying surgery, later Dr. B says surgery. There's nothing in the record to suggest that at some point Dr. A said, geez, you know, this thing's progressing okay, so when Dr. B says surgery, I'm not sure Dr. B is right. Well, what is in the record to suggest that is that Dr. A rules the opposite way on the second go around at the URC. I mean, it suggests that. It would suggest that, but it could also suggest that they were denying him something that they themselves had concluded was medically necessary. Or medically advisable. Remember, too, I mean, they're talking about this in terms of recommending surgeries, and BOP policy, which was cited to Mr. Koester in his exhaustion papers, is that surgery isn't provided for elective purposes on a hernia until it becomes irreducible or begins creating an emergency-type situation. That never happened here, even when he was finally sent out. Well, why didn't you just scrote him? That's not an emergency? No, it wasn't, Your Honor, because it was still reducible, hard to reduce, but still reducible, and then even at that they sent him out. I mean, in many ways, they sort of contravened their own policy in his favor by sending him out as soon as they did. After he filed a lawsuit? I don't know exactly when they ruled that he should have the surgery. I know that the surgery occurred after he filed the lawsuit. That is correct. I know that I'm out of time, but the last issue that I want to raise about this is the four medical defendants did, when their medical judgment was necessary to treat him conservatively, and we've listed all the ways that they did treat him conservatively. These methods of treatment are the same types of conservative treatment prescribed to people on the outside of prisons every day for hernias, and given the sparsity of the number of complaints of pain and discomfort in the record, up until the very end when he went out for surgery, there's no reason to think that they had the subjective knowledge required for deliberate indifference. This isn't just negligence. This is they actually have to know that he's suffering, draw the inference, and choose not to do anything anyway, and we don't see that that happened in this case. Thank you. If I may, I would just like to immediately respond to what was last said by counsel, which is the notion that there's somehow not enough evidence in the record of complaints of pain, and I think when you put what's in the medical record ---- Can you deal with the threshold issue first? Yes, Your Honor. What's Mr. Nelson's standing here? Well, I think the ultimately the estate here has standing. So I don't think there's a standing issue in this case. The question really is whether there's a mootness issue, in other words, whether there's someone who is ready to take this case forward. You stood up and said you're representing Mr. Nelson. Yes. Is he the estate? He is not the estate. What's his relationship with the estate? He is the son of Tony Foster. You've seen his birth certificate? I have not, Your Honor. Have you asked for it? I have not. But opposing counsel represented that they made a request for an easily obtainable proof that he's the son. Why have you not done that? Well, what happened was I did the due diligence on locating next of kin and locating his son. I presented a motion to this court, explained what I did and explained that Jameer Nelson should be appointed as the representative. The government opposed that motion and said they wanted additional proof, et cetera. And at that point, the motions panel appointed Jameer Nelson as the representative. And so at that point, I didn't feel that there was more that I needed to do. He had been appointed as the representative going forward. And obviously I'm willing to cooperate with opposing counsel with this court to address any issues. But as far as I'm concerned, he's been appointed as the representative. How did you learn he was the son? By speaking with his family members. Which family members? Well, I first spoke with his brother and then his mother and then his niece, who had been basically kind of working with Mr. Koster on the case, as I understand it, over the years. And they told you that the decedent had a son and gave you his name and phone number? Yes. They're all, as I understand it, basically in the same area of Cleveland, Ohio. Okay. So the son would not necessarily be the appropriate representative of the estate. We can assume that he died intestate, which still, even given that assumption, that may not mean that the son becomes the legal representative of the estate. It doesn't follow that because he is a son that he necessarily represents the estate. That's possible, Your Honor. I mean, I researched the Ohio intestacy law and it appeared under Ohio law that he would be the person who would inherit the estate. Okay. There was no surviving spouse? They were not. He was not married. Mr. Koster was not married. So if I could, I think what the questioning that we were getting to towards the end about the Utilization Review Committee really is at the heart of this case. And what I'd like to push back on in terms of what the government has said is they basically painted a picture to you that the Utilization Review Committee is kind of like the three of you getting back and kind of discussing things and hashing things back and forth. That's not in the record. All of this is entirely his say-so in terms of his characterization of the Utilization Review Committee. The question is whether we can get to a jury on this issue. And I think if you put together the recommendations by the two doctors and you see that they're the only two doctors on the four-person committee, the other two are nurses or practitioners, then you have fully entitled to an inference that at least would get to a jury on the question of whether the Utilization Review Committee was truly a deliberative body exercising medical judgment or was instead a means of basically stalling and delaying the surgery. And I think this is symptomatic of the government's brief in a number of ways because I'd like to get to that they try to suggest that sort of reducible hernia is just a condition that as a category can't support a deliberate indifference claim. It has to be a medical emergency that you're rushed to the hospital. And they set a slew of unpublished cases to try to get you to take judicial notice of this fact. I mean, they could have presented evidence before the district court in the form of an expert declaration or they could have had Dr. Beam say this is what a hernia means, this is how you treat it. Notably, Dr. Beam's declaration says almost nothing. It just recounts what's already in the medical record. It doesn't explain why decisions were made or how medical judgment was exercised. And I also submit that if you look carefully at the cases cited by the government, you'll see that it's actually there are grounds where cases can be found that a reducible hernia can support a deliberate indifference claim if, for example, while the hernia is still reducible, there's a growth in the size of the hernia or where there are complaints of severe pain. Well, one way would be to follow DERMA, right? I mean, in DERMA there's a prescription given and then for reasons that I don't understand, the prison staff just ignores the doctor's prescriptions. That could have happened here. I mean, you could have had doctors unequivocally telling the prison administrators that this gentleman needs surgery and the prison could have ignored it and that would seem to be your classic case of deliberate indifference, right? Yes, Your Honor, absolutely. And what makes your task tougher is you've got a rather equivocal medical record. It seems that you're putting your reliance, perhaps appropriately so, in this sort of mystical utilization committee where we don't really know what went on, we don't really know what was said. Is the crux of your argument that the structure of this utilization review committee mandates that summary judgment can't be granted because we can't really know, as Judge McKee said, what actually happened there? Well, I think the idea is looking at the whole course of conduct and looking at what happened at the utilization. If you focus on the utilization review committee in August of 2002, you have enough there to support the inference of deliberate indifference because you have the doctors recommending the surgery to the inmate and then denying it when they're kind of back meeting in private. And then you have to couple that with the other statements about how they wouldn't provide the surgery, the refusal to respond to the administrative inquiries, and the suspicious circumstances under which they finally did provide the surgery. And then the background condition that the evidence clearly shows his condition is worsening and he's in extreme pain. So I think when you put all those things together and you can really focus on that utilization review committee time period, then you have the inferences necessary to support his claim going forward. Mr. Roberts, if you could address for a moment the tumor. I'm not clear whether you think that your case is stronger because it developed ultimately that Mr. Koster was suffering from a severe tumor. I'm not sure if that adds anything except sadness to the case. Don't you still have to show that somewhere along the line, very likely at the review committee, there was something that could qualify as deliberate indifference? Well, I think that the presence, obviously people didn't expect the tumor to be there. But what I think that the tumor does is it corroborates his, from a common sense standpoint, allegations that he was in severe pain and having all of these difficulties in daily functioning. And I think it also supports the fact that his condition was progressively worsening. I mean, when you have something where ultimately 50 percent of his abdominal cavity is discovered to be occupied by a tumor, that's pretty strong evidence that there's been a progressive growth and worsening of his condition, even if it's not the condition that they had anticipated in the first instance. But I think where the tumor really comes out in terms of the Bivens claim is probably as damage as proximately caused by the deliberate indifference with respect to the hernia. There is, on the FTCA claim, that's really negligence in failing to diagnose the cancer. And that claim should also be brought, and we haven't had a chance to address it thus far, but the argument that essentially the district court should have permitted him to amend his complaint to bring an FTCA action, and the district court did not permit him to do so. And in part, part of the reason, I think, is that the district court didn't have before it the evidence that, in fact, he had exhausted his FTCA claim, and that it's- Well, that was the reason for the ruling. He was under exhaustion. But in fact, I mean, what the curious thing is that Mr. Koster moves to amend in June of 2004. On May 10th, 2004, the Bureau of Prisons Regional Council had denied his administrative court claim. But then on June 1st, 2004, the defendants submit a declaration from the assistant regional council of the Bureau of Prisons that leaves out the fact that they've denied his claim. And on top of that, they resubmit this same declaration in January of 2005, by which time it should have been self-evident to both the attorneys and to the district court that there's only six months in which the Bureau of Prisons is supposed to have to rule on this. They should have known that by that point a determination one way or the other would have been made. And so, and I think the government says this is sort of some kind of judicial advocacy that's contemplated, but I don't think so because all that the district court had to do was to look at this motion to amend and make a series of binary choices. They had to say to themselves, is this an FTCA claim or a Bivens claim? Well, if it's Bivens, it doesn't make any sense at all, so it should be FTCA. If it's an FTCA claim, has it been exhausted or not? If it has been exhausted, then this is a new claim that can be brought and it should be allowed to go forward. So I think it's a very common-sense approach that the district court could have taken if it had the facts before it and that it's one that's really compelled by this court's direction that the pleadings of pro se plaintiffs should be liberally construed and that the law should be applied even if the pro se plaintiff has not identified that law clearly himself. Mr. Carbos, thank you very much. I also want to thank you. You're pro se and I want to take the opportunity to thank you and your firm and if you'll relay back to the folks you work with at your firm our gratitude and our appreciation for your service and time and effort you put into the case, that would be appreciated. Thank you, Your Honor. Mr. Grokas, I've never seen you before.